FILED
United States Court of Appeals
Tenth Circuit

**July 2, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CATHERINE HARRIS,

       Plaintiff - Appellant,

v.

PROGRESSIVE DIRECT
INSURANCE COMPANY,

       Defendant - Appellee.

No. 16-6336
(D.C. No. 5:15-CV-01252-HE)
(W.D. Okla.)

---

## ORDER AND JUDGMENT[*]

---

Before **TYMKOVICH**, Chief Judge, and **HARTZ & HOLMES**, Circuit Judges.

---

This case arises out of the attempted theft of appellant Catherine Harris's

2006 Ford F-250 diesel truck (the "vehicle") on March 15, 2015, and the

subsequent course of conduct by her insurer, appellee Progressive Direct

Insurance Company ("Progressive"). Ms. Harris believes that Progressive's

treatment of her insurance claim was so unreasonable that Progressive committed

the tort of bad faith under Oklahoma law. The district court disagreed and

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

granted Progressive summary judgment on Ms. Harris's bad faith claim.  We **affirm**.

Briefly stated, Ms. Harris's vehicle sustained damage when thieves attempted without success to steal it away from Marcy Repair Center in Oklahoma City, Oklahoma.  Ms. Harris contacted her insurer, Progressive, in order to obtain coverage for repairs to the body and the vehicle's engine. Although Progressive granted coverage as to the body damage, it determined, after conducting an investigation, that the engine damage likely predated the theft attempt, and was therefore not eligible for coverage under Ms. Harris's policy.

Ms. Harris believes that Progressive acted unreasonably and in bad faith in making that determination against her and filed suit against Progressive in federal court, alleging (1) a breach of contract, and (2) a breach of Progressive's implied duty to deal fairly and act in good faith with its insured (i.e., bad faith).

A jury found for Ms. Harris on the contract claim, awarding her $5,500 in damages.  However, the district court granted Progressive's motion for summary judgment as to the Oklahoma bad faith tort claim.  In its order, the district court held that it did not believe that Ms. Harris made out a prima facie case for bad faith, and that in any event, Progressive successfully availed itself of the "legitimate dispute" defense to show that its reasons for resisting coverage and payment were legitimate and reasonable.  Ms. Harris seeks reversal of this determination on appeal.

# I

## A

Because this case is an appeal from a summary judgment order, we present "the evidence, and draw reasonable inferences therefrom, in the light most favorable to" Ms. Harris as the non-moving party. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1167 n.2 (10th Cir. 2006). Indeed, many of the facts below are undisputed.[1]

The genesis of this case is a theft incident on March 15, 2015, involving Ms. Harris's vehicle. Prior to these events, Ms. Harris and Progressive had entered into an insurance contract providing comprehensive coverage for the vehicle. Progressive does not dispute that the policy was in effect at the time of the theft incident.

Ms. Harris's policy with Progressive provided her coverage applying to losses resulting from "theft or larceny." Aplt.'s App., Vol. I, at 58 ("[W]e will pay for sudden, direct, and accidental loss to a . . . covered auto . . . that is not

---

[1]    In proceedings before the district court, Progressive compiled a list of "Undisputed, Material Facts" as part of its Corrected Motion for Partial Summary Judgment. Aplt.'s App., Vol. III, at 503–19. Ms. Harris admitted most of these Undisputed Material Facts before the district court, and so we will regard them as undisputed here. *See id.*, Vol. IX, at 1906 (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J., dated Aug. 12, 2016) (stating "Plaintiff admits Defendant's facts 1 through 10," "Plaintiff admits Defendant's Facts 12 through 46. Many of these facts are irrelevant," and "Plaintiff admits Defendant's Facts 48 through 55").

3

caused by collision.  A loss not caused by collision includes . . . theft or larceny.").  However, the policy also contained an exclusion that reads:

> Coverage under this Part IV will not apply for loss:
> . . .
> 8. to any vehicle that is due and confined to:
>     a. *wear and tear*;
>     b. freezing;
>     c. *mechanical*, electrical, or electronic *breakdown or failure*; or
>     d. road damage to tires.
>
> This exclusion does *not* apply if the damage *results from the theft of a vehicle*.

*Id.* at 61 (emphases added).

Ms. Harris had taken her vehicle to a repair shop owned by Shannon Marcy because of a steering malfunction.  In the early morning hours of March 15, 2015, unidentified individuals illegally entered the repair shop.  After breaking in, one intruder drove Ms. Harris's vehicle around the shop's parking lot in an apparent attempt to steal the vehicle for a limited period (i.e., less than ten minutes).  The thieves apparently drove the vehicle into a dumpster and might have tried to break the shop's fence by hooking a chain to the truck and the gate, and also by driving the vehicle into the gate.  The latter events cannot be easily observed from video footage of the event as the gate is out of range in the shop's surveillance footage. *See* Aplt.'s App., Vol. XV (DVD of the theft attempt).  The video does show that thieves appeared to shift the gears back and forth on the vehicle several times. *See id.*  The duration of the theft attempt lasted about half an hour.  *See id.*

4

Later in the morning, Mr. Marcy found the truck and noted damage to its body.  Mr. Marcy also discovered that there were problems with the engine.  Mr. Marcy had driven the truck around his lot prior to the theft, and had not noticed any engine issues at that time.  The Lincoln County Sheriff's Office called Ms. Harris later that day to inform her of the theft.

On March 17, 2015, Ms. Harris reported the incident to Progressive using its online claim form, and Progressive assigned Jessica Martin as Ms. Harris's claims handler.  Based on Ms. Harris's claim submission, Ms. Martin noted in her claim notes that Mr. Marcy believed there was engine damage, and set the reserve value for the vehicle at $15,000.

Ms. Martin made a number of calls to Ms. Harris in relation to the claim. On March 18, 2015, Ms. Martin called Ms. Harris to take a recorded statement regarding the damage to her car.  Ms. Harris described the incident, explaining that Mr. Marcy had security video, and that Mr. Marcy informed her of engine problems, but that she had not had any prior issues with her engine.  Ms. Harris further explained how important it was for her to have a truck, as she needed it to transport her special-needs child and related medical equipment to Dallas for medical care.  Near the end of the recorded call, Ms. Martin advised Ms. Harris that "[a]fter we inspect the vehicle tomorrow I'll talk everything over with the adjuster . . . then I will give you a call and we will go over . . . where everything is at on the mechanical side."  *Id.*, Vol. IV, at 748.  Ms. Martin concluded by

5

stating, "whatever else is going on mechanically we will get that resolved." *Id.* at 749.  During this call, Ms. Martin made no mention of the mechanical failure or the wear-and-tear exclusion from coverage.

Ms. Martin continued to gather information related to Ms. Harris's claim. On March 19, Ms. Martin dispatched James Cox to physically inspect the vehicle with Mr. Marcy and Ms. Harris.  Mr. Cox took photographs of the vehicle and the incident location, and reviewed video footage of the theft.  Mr. Cox also spoke to Mr. Marcy, who advised Mr. Cox that he believed the vehicle had its head gaskets blown.

Mr. Marcy believed a tear-down of the engine was required to fix the mechanical damage he attributed to the blown head gaskets, and on March 24, 2015, submitted an estimate of $7,346.47 to Progressive for his anticipated services.  After receiving this estimate, Ms. Martin telephoned Ms. Harris the next day to inform her that the mechanical damage estimate was "much greater than anticipated," and that accordingly Progressive would need to obtain oil samples in order to ascertain whether the damage that Mr. Marcy identified was caused by the theft, or whether it accrued due to mechanical failure or wear and tear.  *Id.* at 507.  That same day, Progressive's Timothy Farar arranged for a forensic oil sample to be taken from the vehicle.  If the head gasket was blown as

Mr. Marcy suspected, then there would be coolant in the oil.[2]  On April 1, 2015,

Progressive employee Michael Fulson joined Mr. Marcy and Ms. Harris at the

repair shop and collected an oil sample.  Mr. Fulson noted that he did not see

signs of leaking in the engine bay.

Sometime between the first interview with Ms. Martin and April 1, 2015,

Ms. Harris exchanged about six or seven phone calls with Ms. Martin that were

not captured in the claim notes.  *See id.*, Vol. IV, at 696–97 (Dep. of Catherine

Harris, dated Mar. 31, 2016).  During those phone calls, Ms. Martin asked Ms.

Harris a series of questions that upset Ms. Harris.  Specifically, Ms. Harris recalls

Ms. Martin accusatorily asking her why her truck was still sitting in Mr. Marcy's

lot over the weekend, and implying that if the truck was "taken up there on

Thursday, [Ms. Harris] should have picked it up on Friday."  *Id.* at 698.  These

calls led to a call memorialized by Ms. Martin in the claim notes for April 1, 2015

in which Ms. Harris stated she was angry with Progressive and felt violated.  *Id.*

at 659.

Progressive received the results from Mr. Fulson's oil test on April 9, 2015,

which showed that there was no coolant in the oil.  Mr. Farar noted that because

the oil test revealed no evidence of oil and coolant mixing, this likely meant that

---

[2]        As explained by Progressive, "[t]he head gasket is the seal between
the engine block and cylinder heads . . . . When a head gasket 'blows' or ruptures,
a tight seal no longer exists between the block and the head, allowing coolant
(antifreeze) to mix with the engine oil."  Aplee.'s Response Br. at 23 n.3.

the head gasket was not blown.  Ms. Martin communicated this information to

Ms. Harris, informing her that additional investigation needed to be done to

determine if engine damage was nonetheless present.  Ms. Martin also advised

that while Progressive would pay for the body damage, the necessary payout

amount for the engine damage could result in the vehicle being totaled and as

such, the damage needed to be investigated further.  Ms. Harris expressed her

desire not to have the vehicle totaled.

Progressive reached out to Mr. Marcy to see if he would conduct a dye test

to investigate the engine issue further, but he declined to do so unless Progressive

agreed to pay for all the repairs listed on his estimate.  Progressive then offered to

have the vehicle towed to a shop of Ms. Harris's choosing for diagnostic testing.

Ms. Harris selected Joe Cooper Ford, where mechanic Doug Dewberry inspected

the vehicle.

Mr. Dewberry's tests revealed that there was in fact an engine problem,

insofar as it was "running rough" due to it "misfiring."  *Id.* at 668.  However, Mr.

Dewberry determined that the engine's running-rough problem was attributable to

an issue with unplugged wire harnesses, and not to blown head gaskets.  Mr.

Dewberry fixed the engine's "running rough" issue by reconnecting the

unplugged wires, after which the "misfiring went away," and Mr. Dewberry was

able to conclude that the engine "ran fine. Actually, [it] ran pretty good."  *Id.*,

Vol. XI, at 2435 (Dep. of Doug Dewberry, dated Apr. 4, 2016).

Although the "running rough" issue was resolved, Mr. Dewberry's
inspection also revealed a previously-undetected problem with the engine.  Mr.
Dewberry smelled the scent of diesel in the coolant.  Mr. Dewberry concluded
based on this fact that the engine most likely had one, and maybe two cracked
cylinder heads in its engine.  Although he determined that he could not "write a
ticket" on those issues without first tearing down the entire engine and visually
inspecting the heads, *id.* at 2457, Mr. Dewberry was confident that the cause of
the smell of diesel was the cracked cylinder heads.  Mr. Farar spoke with Mr.
Dewberry about his findings, and then Ms. Martin communicated those findings
to Ms. Harris.

Ms. Martin also advised Ms. Harris that the engine would have to be torn
down to definitively verify whether it sustained cracks, and the number of such
cracks, and that Progressive was considering the crack a mechanical failure
unrelated to the theft.  Ms. Martin further advised that Mr. Dewberry believed the
crack was small and the leak minimal, and that all that needed to be done was to
subject the engine to a "coolant flush," after which Ms. Harris would be fine to
drive the vehicle, so long as she brought the vehicle back in after a few weeks to
see if more gas was in the coolant.  *Id.*, Vol. IV, at 666.  Ms. Martin stated that,
although the cracked head damage was not caused by the thieves driving the
vehicle or ramming it into the dumpster, Progressive was offering to pay for the
coolant flush and for one more tow to a shop of Ms. Harris's choice.  Ms. Harris,

9

however, declined this offer, insisting, on the advice of Mr. Marcy, that there was an issue with the head gasket.

Ms. Martin entered the initial liability decision on May 1, 2015.  Mr. Farar reviewed the claim on May 4, 2015 and requested a partial denial as he determined the cracked head to be the result of a mechanical failure; the body damage request would be granted.  Then, Ryan Shaughnessy, a Progressive claims manager, reviewed the request, spoke with Mr. Farar about the claim, and authorized the partial denial on behalf of Progressive.

On May 15, 2015, Progressive issued payment to Ms. Harris in the amount of $2,008.03 for body damage to her vehicle (this sum reflects a $1,000 reduction for the deductible), and Ms. Martin issued correspondence advising Ms. Harris of the partial denial for the engine damage.

On May 21, 2015, Matthew Carozza, another Progressive claims manager, wrote a letter to the Oklahoma Insurance Department ("OID") regarding Ms. Harris's claim.  Ms. Harris had previously filed a complaint with OID regarding Progressive's handling of her claim, and Mr. Carozza's letter was issued in response to questions posed to Progressive in association with that complaint.  In the OID letter, Mr. Carozza laid out the factual bases on which Progressive rested its denial.  First, the letter noted that Mr. Carozza studied Ms. Harris's claim, including the police report, the vehicle's recent mechanical history, the opinions of two repair facilities, the forensic oil report and the terms and conditions of the

policy contract.  He then recounted the facts of the theft incident as observed

from the surveillance video, concluding that "we believe the alleged engine

damage existed before the theft and it wasn't caused during [the vehicle's] limited

use." *Id.*, Vol. II, at 356.  Further, he explained that "in reviewing the video

evidence, there's nothing done to the vehicle that would cause or substantiate the

mechanical failure." *Id.*

Mr. Carozza then noted that Mr. Dewberry had "noticed a previously

undetected issue: either a small crack in one of the heads or one of the 'injector

cups' has a crack allowing high-pressure diesel fuel to mix with the coolant." *Id.*

at 357.  Mr. Carozza noted that "a brief Google search confirm[ed] . . . injector

cups wear over time," and as a consequence owners experience the smell of diesel

in the cooling system.  *Id.*  He then went on to explain the "injector cup" theory,

providing an image of where the injector cups are located relative to the rest of

the engine.  He concluded the letter by stating that Progressive had issued funds

to pay for the body damage done to Ms. Harris's vehicle, and attached language

from the insurance contract.

## B

After Progressive denied Ms. Harris's engine damage claim, Ms. Harris

filed suit on November 12, 2015.  Progressive filed an answer to Ms. Harris's

complaint, and Ms. Harris then filed an amended complaint in December 2015.

The amended complaint is the operative one.  In it, Ms. Harris grounded federal

jurisdiction on diversity of citizenship, 28 U.S.C. § 1332, and averred state-law claims stemming from Progressive's alleged breach of its contract of insurance and its duty of good faith and fair dealing ("bad faith claim").  Ms. Harris filed a motion for summary judgment on her breach of contract claim while Progressive filed a motion for summary judgment seeking dismissal of the bad faith claim. The district court denied Ms. Harris's motion as to breach of contract, stating that "there is a genuine factual dispute as to what caused the engine damage." *Id.*, Vol. XII, at 2745 (Dist. Ct. Order, dated Sept. 14, 2016).

The district court granted Progressive's motion for summary judgment as to the bad faith claim, holding that Progressive's efforts to investigate were reasonable, and that it had a "readily defensible basis" for its coverage determination.  *Id.* at 2747.  The court noted that, although it "may well be that an engine tear-down would have provided a more conclusive resolution . . . nothing in the law requires an insurer to investigate a claim exhaustively or to a faultless degree of accuracy."  *Id.*

The parties proceeded to a three-day jury trial on the breach of contract claim.  The jury returned a verdict in favor of Ms. Harris on this claim, and awarded damages in the amount of $5,500.  After another round of briefing, the district court awarded attorneys' fees, costs, and expenses to Progressive as the prevailing party on the bad faith claim, totaling approximately $177,000.  This appeal ensued.

## II

### A

We review the district court's summary-judgment order de novo, applying the same legal standards used by the district court. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit" and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, in the summary judgment context, we engage in "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

### B

Because our jurisdiction is based on diversity of citizenship, we apply the substantive law of the forum state, and it is undisputed that, under the facts of this case, Oklahoma's substantive law controls the resolution of Ms. Harris's bad faith claim. *See, e.g.*, *Scottsdale Ins. Co. v. Tolliver*, 636 F.3d 1273, 1277 (10th Cir. 2011) ("Since this case is grounded on diversity jurisdiction, we are obligated . . . to apply the substantive law of the forum state, in this case Oklahoma, but we

apply federal procedural law."); *Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998) ("Since the present case is grounded on diversity jurisdiction, we first note that Oklahoma provides the substantive rules of law which govern this action."); *see also Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 174 F.3d 1115, 1118 (10th Cir. 1999) (noting that, in diversity cases, we apply "the substantive law of the forum state, including its choice of law principles").

In 1977, in the context of a disability insurance policy, the Supreme Court of Oklahoma recognized a tort arising from an insurer's breach of the "implied duty to deal fairly and act in good faith with its insured" with respect to insurance claims. *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1977). As that court explained, an insurance company has an obligation "not for the payment of money only," but also "to deal fairly with its insured." *Id.* Since "in every insurance contract there is an implied covenant of good faith and fair dealing," insurance companies that breach this covenant may be held liable in tort. *Id.* On the other hand, the court held that "tort liability may be imposed only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured." *Id.* at 905.[4]  Shortly after

---

[4]       Subsequently, the court remarked that "[t]he special relationship between the insurer and its insured gives rise to such a duty [of good faith dealing], especially in light of the quasi-public nature of the insurance industry and the unequal bargaining power of the parties." *Buzzard v. Farmers Ins. Co.* ("*Buzzard II*"), 824 P.2d 1105, 1109 (Okla. 1991).

recognizing the bad faith tort in *Christian*, the Oklahoma Supreme Court clarified that this tort applies to all insurance companies.  *See McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 588 (Okla. 1981).

"At the outset it is noted that a party prosecuting a claim of bad faith must plead the elements of the tort and he/she has the burden of proof."  *Id.*  at 587. To make out a prima facie case of bad faith, the essential elements an insured must show are: 1) coverage under the insurance policy and that the insurer was required to take reasonable actions; 2) the actions of the insurer were unreasonable under the circumstances; 3) the insurer failed to deal fairly and act in good faith toward the insured in its handling of the claim; and 4) breach or violation of the duty of good faith and fair dealing was the direct cause of any damages that the insured sustained.  *See, e.g.*, *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005).  The "minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award against said insurer."  *Id.* at 1094.

Although the insured is required to prove all four elements, the reasonableness of the insurer's investigation is often the main issue in a bad faith case.  *Hale v. A.G. Ins. Co.*, 138 P.3d 567, 573 (Okla. Civ. App. 2006).  "[T]he essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified

withholding of payment due under a policy." *McCorkle*, 637 P.2d at 587. We

evaluate the reasonableness of the insurer's actions "in light of all the facts

known or knowable [to it] concerning the claim at the time [the insured]

requested [the insurer] to perform its contractual obligations." *Buzzard v.*

*McDanel* ("*Buzzard I*"), 736 P.2d 157, 159 (Okla. 1987).[5]

---

[5]     Ms. Harris suggests that Progressive faces a very difficult—if not insurmountable—legal hurdle in defending the district court's grant of summary judgment because typically questions of reasonableness and bad faith are questions for the jury.  In this regard, Ms. Harris highlights the following language from *McCorkle*: "[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case."  *McCorkle*, 637 P.2d at 587.  Ms. Harris also cites to language from the Oklahoma Supreme Court's decision in *Falcone v. Liberty Mutual Insurance Co.*, 391 P.3d 105, 108 (Okla. 2017) ("We hold the significance of the undisputed facts, and whether [insurer's] actions over the course of their negotiations constituted bad faith, are questions for the trier of fact.").

Ms. Harris's suggestion, however, is misguided.  First, it is so, insofar as Ms. Harris's reliance on state authorities reflects her belief that state law governs the question of whether summary judgment is available to resolve particular issues, as matter of law, in diversity cases.  *See Stanko v. Maher*, 419 F.3d 1107, 1112 n.5 (10th Cir. 2005) ("Federal law rather than state law governs the use of summary judgment in the federal courts."); 10A Charles Alan Wright, et al., FED. PRAC. & PROC. § 2712, Westlaw (4th ed., database updated Apr. 2018) ("[I]n diversity-of-citizenship actions questions relating to the availability of summary judgment, such as whether there is a disputed issue of fact that is sufficient to defeat the motion, are procedural and therefore governed by Rule 56, rather than by state law."); *accord Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) ("The availability of summary judgment in diversity actions is governed by the federal standard, embodied in Fed. R. Civ. P. 56, rather than by state law."); *see also C. F. Braun & Co. v. Oklahoma Gas & Elec. Co.*, 603 F.2d 132, 133 n.1 (10th Cir. 1979) ("The propriety of summary judgment in federal diversity cases must be evaluated in light of the Federal Rules of Civil Procedure rather than state procedural law, but with reference to the state's substantive law."); *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 812 n.2 (10th Cir. 2016) (unpublished) (noting that "[w]hether summary judgment should have been granted in this federal diversity case is therefore governed by the standard found in the Federal Rules of Civil Procedure as applied to Oklahoma's substantive law" and that, therefore, plaintiff's reliance on an Oklahoma judicial decision as a benchmark for when summary judgment should be granted was "misplaced").

(continued...)

Recognizing, however, that not all insurance disputes arise out of an

insurer's bad faith, the Oklahoma Supreme Court has held that a bad faith "cause

of action will not lie where there is a legitimate dispute." *Manis v. Hartford Fire*

*Ins. Co.*, 681 P.2d 760, 762 (Okla. 1984).  The holding in *Manis* stems from the

court's acknowledgment that the *Christian* tort might stretch too broadly if

unrestrained by a limiting rule—i.e., the legitimate dispute defense.  The

existence of a legitimate dispute negates an "inference of bad faith" as a "matter

---

[5](...continued)

And our federal precedent has not been reluctant to enter summary judgment
against Oklahoma bad faith claims under the standards of the federal rules.  *See,
e.g.*, *Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1256 (10th Cir. 2010)
("Because we conclude the evidence in the record does not support a finding of
bad faith under Oklahoma law, we affirm the district court's grant of summary
judgment to Defendant on the issue of bad faith."); *Wolf v. Prudential Ins. Co. of
Am.*, 50 F.3d 793, 799 (10th Cir. 1995) (concluding that the insurance company
"had a justifiable basis for denying coverage under the [insured's] plan, and is
entitled to summary judgment on the bad faith claim with respect to [that] plan.").

Moreover, even on its own terms, Ms. Harris's suggestion is misguided.
Nothing in *McCorkle* suggests that summary judgment cannot be awarded against
a bad faith claim where the undisputed facts make clear that the insurance
company acted reasonably when investigating and handling the insurance claim at
issue.  And, in a subsequent case, the Oklahoma Supreme Court squarely held that
summary judgment could indeed be awarded against a bad faith claim because
"[t]he evidentiary material submitted by the parties to the trial court does not
show a material dispute concerning the facts" on the bad faith claim.  *Skinner v.
John Deere Ins. Co.*, 998 P.2d 1219, 1223 (Okla. 2000).  Lastly, *Falcone*'s
holding cannot be read to foreclose all summary judgment awards against bad
faith claims.  *Falcone* merely held that the question of bad faith "*in this case*"
was "a fact question for a jury."  391 P.3d at 107. (emphasis added).

of law." *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993). A legitimate dispute arises when the "[f]acts were in dispute" as to coverage and where the insurer "had a valid defense to plaintiff's claim." *Manis*, 681 P.2d at 762. As such, "[t]he insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a legitimate dispute as to coverage or amount of the claim, and the insurer's position is reasonable and legitimate." *Oulds*, 6 F.3d. at 1436 (internal quotations and citations omitted).

*Manis* laid the groundwork for a burden-shifting framework: once the insured makes a prima facie showing of all four factors enumerated in *Badillo*, the burden shifts to the insurer to show that it had a "reasonable, actually-relied-upon basis for denying [the insured's claim]"—i.e., that a legitimate dispute existed. *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1131 (10th Cir. 2012). If the insurer successfully demonstrates that a legitimate dispute existed, the burden shifts back to the insured to make an additional showing that the denial of coverage was undertaken in bad faith. *See, e.g., Timberlake Constr. Co. v. U.S. Fid. and Guar. Co.*, 71 F.3d 335, 344 (10th Cir. 1995) (holding that once the insurer demonstrated the existence of a legitimate dispute, it was the insured who "needed to produce additional evidence of bad faith in order to send the issue to a jury").

Appellate Case: 16-6336   Document: 010110015785   Date Filed: 07/02/2018   Page: 20

### III

On appeal, Ms. Harris challenges the district court's grant of summary judgment as to her bad faith claim.  We conclude that under the undisputed facts of this case, Ms. Harris cannot make out a prima facie case for bad faith as a matter of law.[6]  Specifically, we hold that Ms. Harris's bad faith claim fails because she cannot show that Progressive acted unreasonably in handling her insurance claim.

### A

At the outset of our analysis, we reject Ms. Harris's argument that Progressive owed her a duty to "give [her] interests equal consideration."  Aplt.'s Opening Br. at 24 (citing *State Farm Mut. Auto. Ins. Co. v. Skaggs*, 251 F.2d 356, 359 (10th Cir. 1957)).  More specifically, Ms. Harris maintains that bad faith can be committed when an insurer fails to treat its insured as an equal during the course of its investigation.  *See id.* at 23–29.  She relies on our decision in *Skaggs*, but Ms. Harris misconstrues our holding there.

---

[6]    As noted, the four elements of a prima facie bad faith claim are that: 1) the insured has coverage under the insurance policy and that the insurer was required to take reasonable actions; 2) the actions of the insurer were unreasonable under the circumstances; 3) the insurer failed to deal fairly and act in good faith toward the insured in its handling of the claim; and 4) breach or violation of the duty of good faith and fair dealing was the direct cause of any damages sustained by the insured.  *See Badillo*, 121 P.3d at 1093.

The language in *Skaggs* on which Ms. Harris relies must be understood in its context:

> Where an insurance company, under the terms of its liability policy has the duty to defend an action brought against its insured and the right to control the defense of the action and determine whether a compromise of the claim shall be made, and the insurance company assumes such defense, while it may properly give consideration to its own interests, *it must in good faith give equal consideration to the interests of the insured and if it fails to do so, it acts in bad faith.*

*Skaggs*, 251 F.2d at 358–59 (emphasis added). Contrary to Ms. Harris's suggestion, *Skaggs* does not impose an independent good faith duty on insurers to "give equal consideration" to the interests of insureds.

Critically, *Skaggs* did not involve a tort claim for the breach of bad faith: it was premised on a contract claim for violation of the duty of good faith.  And, as might be apparent from the date of the opinion, the *Skaggs* panel could not possibly have intended for its language to apply to an Oklahoma tort claim of bad faith, as the opinion predated the Oklahoma Supreme Court's establishment of the tort by twenty years.  *Compare Skaggs*, 251 F.2d at 356 (announcing decision in 1957), *with Christian*, 577 P.2d at 899 (establishing for the first time, the tort of bad faith in 1977); *see also Manis*, 681 P.2d at 761 (noting that the tort of bad faith "cause of action was first allowed in Oklahoma in *Christian*").[7]  As such,

---

[7]     Even beyond that, *Skaggs* is factually inapposite. *Skaggs* involved a third-party liability issue.  The full context of the excerpted quote shows that

(continued...)

Ms. Harris's bad faith claim cannot be predicated on the notion that the insurer failed to "give equal consideration to the interests of the insured."  The only duty Progressive owed to Ms. Harris was to treat her in good faith and to act reasonably in handling her claim.  *See Badillo*, 121 P.3d at 1093.

## B

As explained by the Supreme Court of Oklahoma in *McCorkle*, "the essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy."  *McCorkle*, 637 P.2d at 587.  Ms. Harris identifies many interactions with Progressive that she believes show Progressive's unreasonable, bad faith conduct toward her.  None of them supplies grounds for sending Ms. Harris's bad faith claim to a jury.

## 1

Ms. Harris argues that Progressive mishandled her claim from the very beginning.  She first takes issue with the fact that Ms. Martin, her claims handler, "set the reserves below the max, despite thinking [that Ms. Harris's claim] might be a max-loss claim from Ms. Harris's online claim report."  Aplt.'s Opening Br. at 23.  By this, Ms. Harris means that Ms. Martin set the reserve value, or what

---

[7](...continued)
*Skaggs* does not relate to an instance involving a straightforward insurance claim between an insurer and an insured.

the insurance company believes might be its potential future liability related with the claim, at $15,000, as opposed to a range between the values of $15,700 to $17,225.[8]  Ms. Harris imputes bad faith to Progressive because the $15,000 figure submitted by Ms. Martin was smaller than the two higher figures it could have selected.  But Ms. Harris's argument fails at the threshold because it was forfeited.

Specifically, as noted by Progressive, Ms. Harris failed to raise this argument before the district court.  A party forfeits an argument for reversal not raised in the district court.  *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) ("[I]f the theory simply wasn't raised before the district court, we usually hold it forfeited."); *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) ("We have therefore repeatedly stated that a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory.").  And Ms. Harris has failed to argue for plain error on appeal.  "[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first

---

[8]      Ms. Harris provides the court with a calculation of what she believes is the max-loss value of her car.  She first notes that Ms. Martin found that the National Automobile Dealers Association value of her car is between $15,200 and $16,725.  Subtracting the $1,000 deductible and adding in the $1,500 rental insurance associated with Ms. Harris's policy, Ms. Harris believes that the max-loss reserve value for her car should have been $15,700 to $17,225.

presented to the district court"—*viz.*, that argument ordinarily will not be reviewed at all. *Richison*, 634 F.3d at 1131; *accord Bishop v. Smith*, 760 F.3d 1070, 1095 (10th Cir. 2014); *see Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016) (noting that a litigant failed to "make an argument for plain error review on appeal" and, as a consequence, his "argument has come to the end of the road and is effectively waived"). And we decline to review Ms. Harris's max-loss argument here.[9]

Ms. Harris also appears to claim that it was unreasonable for Ms. Martin not to advise her that (consistent with state law) she could keep her vehicle even if it became totaled as a result of an engine tear-down. Ms. Harris's briefing on this issue is somewhat unclear, but the argument appears to boil down to this: Ms. Martin advised Ms. Harris that tearing down the engine would likely result in her car being totaled —i.e., that it would suffer a total loss. Ms. Harris apparently

---

[9]     Even if we were inclined to exercise our discretion to reach this argument, it is unlikely that it would avail Ms. Harris. The $15,000 figure entered by Ms. Martin is only $700 or $2,225 less than the value calculated by Ms. Harris. Even assuming that Ms. Martin's figure was off the mark, the difference in amount is much more likely attributable to Ms. Martin's lack of care in hastily setting the initial reserve value than to any bad-faith attempt to gouge Ms. Harris out of $700 or $2,225. *See* Aplee's Response Br. at 16 (noting that Ms. Martin set the reserve an hour and a half after Progressive received the claim without first having spoken to Ms. Harris or inspected the vehicle). Hastiness in this context does not equate to bad faith, as "the minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence." *Badillo*, 121 P.3d at 1094.

believed that totaling her vehicle would mean that she would no longer be able to keep it.  Ms. Martin did not correct Ms. Harris regarding this apparently mistaken belief, supposedly so that Progressive would be "able to justify its 'investigation'" under the pretense that "it was helping to avoid totaling the car." Aplt.'s Opening Br. at 24; *see id.* at 8 (noting that Progressive did not inform Ms. Harris that, even if the vehicle was totaled, she would still be able to keep it, but rather "told her that it would not be wise to repair the vehicle and they needed more investigation").  According to Ms. Harris, she would have happily allowed her car to be totaled—and thus to have Progressive pay for the repairs—had she known that totaling a car was not equivalent to not being able to keep it.

The claim notes for the phone call in question provide color to Ms. Harris's account of the conversation.  They indicate that Ms. Martin advised Ms. Harris that Mr. Marcy's newly-suggested repairs "pushes [repair costs] much closer to totaling" than previously calculated.  Aplt.'s App., Vol. IV, at 658 (claim note by Ms. Martin, dated Mar. 25, 2015).  It appears that Ms. Harris then expressed that she did not want the car totaled because she really wanted to keep it.  Ms. Martin then commented that it would not be wise to repair the vehicle if mechanical issues were going to cost upwards of $10,000.  Ms. Harris, for her part, apparently agreed.

Based on this sequence of events, it cannot be said that Ms. Martin acted unreasonably in omitting the apparent fact that Ms. Harris could keep her car even

if it was totaled.  Ms. Harris herself agreed and understood that it would not be wise to repair the engine damage if the total cost of repairs was going to exceed $10,000.  Even assuming *arguendo* that Ms. Martin could be deemed negligent in omitting this fact, that is not good enough to establish liability under the bad faith tort.  *See Badillo*, 121 P.3d at 1094 (noting that the "minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence").  There is no triable inference that Ms. Martin intentionally omitted the fact in order to continue investigating and delay paying Ms. Harris.

Ms. Harris also contends that Progressive acted unreasonably by revoking its offer to pay for the entirety of Ms. Harris's loss after receiving Mr. Marcy's cost estimate totaling $7,346.47.  Ms. Harris further argues that Progressive's insistence on continuing the investigation after receiving Mr. Marcy's greater-than-anticipated repair estimate was evidence of a bad faith effort to evade its liability by generating a sham dispute.

We cannot say, however, that a rational jury could find these actions by Progressive to be unreasonable.  First, Ms. Harris's belief that there was an initial promise by Progressive to pay all of her loss associated with the mechanical damage (which it subsequently revoked) appears to be based on a strained understanding of what Ms. Martin said.  Specifically, Ms. Harris takes Ms. Martin's statement, "whatever else is going on mechanically we will get that resolved," entirely out of context.  Aplt.'s Opening Br. at 7 (citing Aplt.'s App.,

26

Vol. IV, at 749).  To be sure, taken alone, the statement conceivably might be understood as a representation from Progressive, as of March 18, 2015, that it would pay for all mechanical damage to Ms. Harris's vehicle.  However, such a representation would seem to fly in the face of prudent business practices, since at that point, Progressive had not conducted any investigation of the reported incident.  More importantly, the statement cannot be taken alone; it must be understood in context.  When one does so, Ms. Martin's statement is reasonably understood as communicating to Ms. Harris that Ms. Martin would resume a discussion with Ms. Harris regarding what mechanical issues are covered and resolvable under the policy after an inspection set for the following day.  Aplt.'s App., Vol. IV, at 748 (Ms. Martin: "After we inspect the vehicle tomorrow I'll talk everything over with the adjuster . . . then I will give you a call and we will go over . . . where everything is at on the mechanical side.").  Thus, a reasonable jury could not conclude that, based on Ms. Martin's March 18 representations to Ms. Harris, that Progressive had promised to pay for any and all mechanical damage sustained by Ms. Harris's vehicle, and then later unreasonably revoked its promise.

As for Progressive's continuation of the investigation, it appears that Ms. Harris herself acknowledged that it was not unreasonable for Progressive to have requested additional diagnostics after receiving Mr. Marcy's higher-than-expected estimate.  *Id.* at 705 (Ms. Harris responded "no" when asked whether she thought

it "was unreasonable at that point in time for Progressive to want to do more

testing").  In our view, a jury could not rationally find that Progressive acted

unreasonably by deciding to investigate a claim further after learning that the

potential value of Ms. Harris's claim had increased substantially.  Any

reasonable, economically-driven insurer would likely investigate the requested

repair amount further, and Ms. Harris herself seemed to admit as much.  *See id.*

Thus, we conclude that Ms. Harris has not demonstrated that Progressive

breached its duty simply by electing to conduct further investigatory steps before

reaching a final conclusion regarding the claim.

Ms. Harris also says that "Progressive treated [her] suspiciously, suggesting

she was involved in the loss, despite finding [] no criminal or financial history."

Aplt.'s Opening Br. at 24.  To support this argument, Ms. Harris refers to her

deposition, in which she recounted having several conversations with Ms. Martin

that made her feel as though she "was getting the runaround."  Aplt.'s App., Vol.

IV, at 696–99.  Although no claim notes were recovered regarding the apparently

relevant "six or seven calls," *id.* at 697, Ms. Harris avers that Ms. Martin posed a

series of questions to Ms. Harris, such as "why [her] truck was still sitting up [at

Mr. Marcy's lot] over the weekend," and asserting that "[i]f it was taken up there

on Thursday [Ms. Harris] should have picked it up on Friday."  *Id.* at 697–98.  In

sum, Ms. Harris alleges that Progressive acted with bad faith because—through

these conversations—Progressive treated her suspiciously and suggested that she was involved in the loss.

Because no record can be found of claim notes that would relate to these conversations, and our standard of review obliges us to construe the facts in a light most favorable to Ms. Harris, we assume that the conversations described above happened in the manner that Ms. Harris recounts them. Even so, we cannot hold that a reasonable jury could infer Progressive's bad faith from these conversations. More specifically, by their terms, Ms. Martin's alleged questions did not amount to accusations that Ms. Harris was complicit in damaging her vehicle; nor do they evince bad faith. Moreover, Ms. Martin's own notes indicate that she had determined, by March 24, 2015, that Ms. Harris was not involved in the theft incident.

In sum, despite her claims of egregious action by Progressive and its employees, none of the foregoing allegations of unreasonableness pass muster. Upon close inspection, these claims of unreasonableness by Ms. Harris appear to be "mere *allegation[s]* that [Progressive] breached the duty of good faith and fair dealing," and such conclusory statements "do[] not automatically entitle a litigant to submit the issue to a jury for determination." *Oulds*, 6 F.3d at 1436 (emphasis added).

**2**

As for Progressive's conduct of the investigation, Ms. Harris asserts that it was unreasonable for Progressive to "[o]n its own . . . use[] Google to find another possible area the engine could have been damaged," when it "had no evidence of the cause of the engine damage."  Aplt.'s Opening Br. at 25.  The Google search at issue helped confirm in a small way Progressive's view that there was "another possible diagnosis" for why an odor of diesel was detected in the coolant, despite the absence of actual diesel in the coolant itself.  Aplt.'s App., Vol. IV, at 669 & Vol. II, at 357.  Ms. Harris's main contention seems to be that there was no reason for Progressive to look to Google, and the fact that Progressive did so reflects its willingness to look anywhere and everywhere to avoid finding a basis for coverage.

We disagree that Progressive's Google search demonstrates that it acted in bad faith.  If anything, Progressive's Google search tends to show that it sought to conduct a thorough investigation, including attempting to investigate all possible causes for why the coolant smelled of diesel.  Mr. Carozza's letter to the OID explains how Progressive performed this Google search and used the information from it:

> The [Joe Cooper Ford] dealership noticed a previously undetected issue: either a small crack in one of the heads or one of the "injector cups" has a crack allowing high-pressure diesel fuel to mix with the coolant. . . . The recommended diagnosis is an engine tear down.  At this time, the evidence supports that this

> is wear and tear and not related to the [theft] loss.  As noted
> below, you can see where the injector cup rests within the head
> of the motor.  This cup rests right up next to the coolant passage.
> It's commonly noted (*a brief Google search confirms this*) that
> these injector cups wear over time and the symptoms owners
> experience, are trace contaminants and smell of diesel in the
> cooling system. . . . This is the most logical explanation for the
> smell of diesel in the cooling system of the F-250. . . . *All the
> evidence considered*, gives credence to the fact that this
> mechanical condition was pre-existing to this loss ever occurring.

Aplt.'s App., Vol. II, at 356–57 (emphases added).  The quoted discussion

indicates that Mr. Carozza simply used Google as a tool to provide one small,

additional measure of confirmation of one theory grounded in the evidence

regarding the cause of the diesel smell.  Rather than find that the search evinced

Progressive's bad faith, a reasonable jury would conclude that it was one more

sign of the thoroughness of Progressive's investigation.  Significantly, though Mr.

Carozza's letter suggested that there was some uncertainty regarding whether the

crack was in the cylinder heads or the injector cups, and Mr. Carozza personally

viewed the latter theory to be the "most logical" (with confirmation from the

Google search), what was *not* uncertain was that "this mechanical condition [i.e.,

the cracks in either the cylinder heads *or* the injector cups] was pre-existing to

this [theft] loss ever occurring."  *Id.* at 357.  Consequently, the condition would

not be covered by the policy.

Ryan Shaughnessy, the Progressive employee who "made the decision on

behalf of Progressive to issue the partial denial concerning the engine claim,"

ultimately favored the theory that the cracks were in the cylinder head,

specifically, that "there were small cracks in the cylinder head around the fuel

injector cups." Aplt.'s App., Vol. III, at 516, 518. And he offered strong reasons

for believing that any such cracks were a preexisting condition that did not result

from the theft incident. According to Mr. Shaughnessy, cylinder head cracks

could only have resulted from either: (1) repeated stress over a long period of

time due to normal expanding and contracting as the motor starts, heats, and cools

over hundreds of thousands of miles—i.e., wear and tear, or (2) a severe and high

velocity impact with resulting compartmental damage.[10]

---

[10]     Ms. Harris argues that we should not rely on Mr. Shaughnessy's
reasoning for why any cracks in the cylinder heads constituted a preexisting
condition caused by wear and tear. She argues that Mr. Shaughnessy's theory
"did not appear until discovery," and therefore, did not constitute evidence known
or knowable to the insurer prior to denial. Aplt.'s Reply Br. at 7 (citing *Buzzard
I*, 736 P.2d at 159). The Supreme Court of Oklahoma held in *Buzzard I* that an
insurer's actions "must be assessed in light of all the facts known and knowable
concerning the claim at the time petitioners requested [insurer] to perform its
contractual obligations." *Id.*; *accord Conti v. Republic Underwriters Ins. Co.*,
782 P.2d 1357, 1362 (Okla. 1989). Ms. Harris argues that this rule precludes us
from now relying on Mr. Shaughnessy's theory. This argument is unpersuasive
for a few reasons.

        First of all, we may decline to consider it because Ms. Harris has waived it.
Progressive had submitted Mr. Shaughnessy's theory as part of Undisputed Fact
No. 53 in its Motion for Partial Summary Judgment, Aplt.'s App., Vol. III, at
516–19; Ms. Harris subsequently admitted Fact No. 53 in its entirety. *See id.*,
Vol. IX, at 1906 (stating "Plaintiff admits Defendant's Facts 48 through 55").
Where, as here, there is an "intentional relinquishment or abandonment" of an
objection in the district court, we need not entertain the argument. *United States
v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007) (quoting *United States*

(continued...)

Based on his review of the complete file—which included claim notes

regarding Progressive's earlier review of the surveillance video and its resulting

_____

[10](...continued)
*v. Olano*, 507 U.S. 725, 733 (1993)).  This waiver conclusion, standing alone, would be sufficient for us to reject Ms. Harris's argument.

But we also find Ms. Harris's argument unpersuasive on the merits.  Under the *Buzzard I* rule, we are hard-pressed to conclude that a rational jury would not find that Mr. Shaughnessy's theory was at least knowable, if not known, at the time Progressive denied Ms. Harris's claim.  Prior to the denial, Mr. Dewberry of Joe Cooper Ford theorized that the smell of diesel in the coolant was likely due to cracked cylinder heads and he communicated this information to Progressive.  Mr. Shaughnessy was aware of this information when he denied the claim.  Prior to *and* after his denial, it is undisputed that Mr. "Shaughnessy ha[d] extensive training and experience ('hundreds of thousands of hours') in the diagnosis and repair of diesel engine damage."  Aplt.'s App., Vol. III, at 516.  Mr. Shaughnessy necessarily drew on this experience in denying the claim.  The fact that Mr. Shaughnessy did not take the time to articulate his theory for why the cracked heads constituted a preexisting condition caused by wear and tear hardly means that this theory was not at the very least knowable—if not known—to him.  That is to say, we are hard-pressed to believe based on the evidence that a rational jury would find that, at the time he denied the claim, Mr. Shaughnessy was not "capable of discovering" this theory—if he had not already discovered it.  *First Bank of Turley v. Fid. & Deposit Ins. Co. of Maryland*, 928 P.2d 298, 305 (Okla. 1996).

Lastly, even if Ms. Harris prevailed on her argument, it would not alter the outcome.  More specifically, even accepting (for purposes of argument) that Mr. Shaughnessy's theory was not known or knowable to Progressive, grounded in Mr. Dewberry's findings, Mr. Carrozza's certainly was.  A mere two weeks after Mr. Shaughnessy denied the claim, Mr. Carozza articulated a theory to OID for why there was a smell of diesel in the coolant involving worn injector cups.  And, as we have noted, whether this theory was correct, or whether the one involving cracked cylinders was true, Progressive could have reasonably concluded that "th[e] mechanical condition was pre-existing to this [theft] loss ever occurring." Aplt.'s App., Vol. II, at 357.  Consequently, the condition would not be covered by the policy.

conclusion that the incident was of limited duration (i.e., less than ten minutes)—and drawing on his undisputedly considerable education, training, and experience, Mr. Shaughnessy concluded that there was no high-force impact or collision during the theft of the kind necessary to cause cracks to develop in the cylinder heads.  Aplt.'s App. Vol. IV, at 669, Vol. V, at 992–1003, Vol. XI, at 2537–40.[11]  Thus, Progressive ultimately concluded that "the evidence suggests this [damage] is long term wear tear.  And not vand[a]lism damage consistent with [the vehicle] being driven in a parking lot."  *Id.*, Vol. IV, at 669.

Far from having "no evidence," Progressive has shown that there was abundant evidence supportive of a denial based on the contract's exclusionary clause.  As noted by Progressive, its actions were "reasonably appropriate under the circumstances."  *Buzzard v. Farmers Ins. Co., Inc.* ("*Buzzard II*"), 824 P.2d

---

[11]     In his subsequent correspondence to OID, Mr. Carozza offered a helpful description of the evidence before Progressive, and noted its ultimate conclusion that there was no valid claim for engine damage:

> The video surveillance confirms that vandals trespassed on the property, entered several vehicles, then drove this vehicle striking a dumpster, and attempted to ram the front gate. The suspects abandoned the vehicle after not being able to get it off the premises. The vehicle was inspected and we covered its physical damage. . . . Ms. Harris contends that there's additional loss related damages to the motor as it was running rough. However, upon review of the presented facts, including the forensic oil analysis, we believe the engine damage existed before the theft and it wasn't caused during its limited use.

Aplt.'s App., Vol II, at 356.

1105, 1109 (Okla. 1991).  As the district court put it, "[i]t may well be that an engine tear-down would have provided a more conclusive resolution, but nothing in the law requires an insurer to investigate a claim exhaustively or to a faultless degree of accuracy."  Aplt.'s App., Vol. XII, at 2747; *see also id.*, Vol. XI, at 2537–38 (in rejecting the suggestion that a tear-down was necessary to pinpoint the precise location of the cracks, Mr. Shaughnessy stated, "whether or not the location of the crack was on the left side cylinder head or the right side cylinder head, it was *impossible* that that crack occurred due to this theft" (emphasis added)).  Indeed, given its extensive investigative efforts, Progressive's refusal to conduct a further tear-down of the engine was patently reasonable under the circumstances.

Our case law supports the district court's conclusion.  For instance, the investigation that we labeled "adequate" under Oklahoma law in *Bannister* was significantly less thorough than the one at bar.  *Bannister*, 692 F.3d at 1131 n.15.  There, after being involved in a one-vehicle (specifically, a motorcycle) accident, Mr. Bannister, the insured, filed a claim with his insurer, State Farm.  *See id.* at 1119–20.  The record before the *Bannister* panel revealed that State Farm took statements from Mr. Bannister and his wife, obtained a police report, and internally discussed Mr. Bannister's claim.  However, State Farm did not investigate whether Mr. Bannister was drunk at the time of the accident, or whether he was following the vehicles in front of him too closely.  *Id.* at 1132.

35

Significantly, we noted that, if State Farm had investigated further and "obtained Bannister's hospital record from the aftermath of the accident . . . State Farm would have discovered . . . that Bannister's blood-alcohol level was 0.09" (that is, above the legal alcohol limit).  *Id.* at 1131, 1132 & n.16.  Despite State Farm's investigative oversight, we held that the "facts of the crash scenario alone—a single vehicle accident where the car in front of the claimant braked suddenly, and the claimant had insufficient space timely to stop" were sufficient to defeat the insured's bad faith claim.  *Id.* at 1130.  It is easy to see that Progressive's investigation was far more thorough than the one conducted in *Bannister*.[12]

---

[12]    To underscore the point, it is worth recapping its efforts.  Progressive made numerous calls to Ms. Harris about the claim.  Progressive directed an employee to physically inspect the vehicle, take photographs of its condition, observe and photograph the location where the theft attempt occurred, review the surveillance footage from the night of the attempt, and draft an estimate of the body damage done to the exterior of the vehicle.  Progressive then dispatched another employee to Mr. Marcy's shop (where the vehicle was located during the theft attempt) to obtain an oil sample to verify Mr. Marcy's diagnosis of engine damage—more specifically, blown head gaskets.  Mr. Marcy recommended a tear-down of the engine, but Progressive elected to proceed incrementally and first conduct a less invasive oil test.  Once the oil sample indicated that Mr. Marcy's diagnosis was incorrect, Progressive engaged in further testing, and had Ms. Harris select a shop at which the testing would be performed.  Mr. Dewberry, the technician at the selected shop, ran a series of tests and concluded, consistent with the results of the forensic oil test, that the engine issue was not with the head gasket, as Mr. Marcy had believed.  Mr. Dewberry determined that the engine did have a problem, insofar as it was running rough.  But Mr. Dewberry found that this problem actually was easily resolved by reconnecting two loose wires, which he promptly did.  However, Mr. Dewberry did observe evidence of a further issue with the engine; specifically, that there may be one or more cracks in the cylinder heads.  Progressive, for its part, spent considerable time compiling information

(continued...)

Bolstered by *Bannister*'s reasoning, we conclude that Progressive's conduct did not evince bad faith as a matter of law.

In sum, we conclude that Ms. Harris has failed to make a showing that the evidence in the record supports even a prima facie bad faith claim. No rational fact-finder would have determined that Progressive acted unreasonably given the manner in which Progressive handled the claim. *See Buzzard II*, 824 P.2d at 1109. Put another way, no reasonable jury could find that Progressive engaged in "unreasonable, bad-faith conduct." *McCorkle*, 637 P.2d at 587. This alone is sufficient for us to affirm the judgment of the district court. Thus, we need not delve into whether Progressive also has made out a legitimate dispute defense.

## IV

As an ancillary matter, the parties dispute the propriety of Progressive's Supplemental Appendix. Aplee.'s Supp. App. at 1–36. Ms. Harris moves to strike the Supplemental Appendix in part because it is duplicative of materials already included in her Appellant's Appendix, and in part because she argues that Progressive previously had, but definitively passed up, an earlier opportunity to include the Supplemental Appendix materials in her Appellant's Appendix. *See*

---

[12](...continued)
about the claim. *See* Aplt.'s App., Vol. IV, at 645–73 (compiling all of the claim notes associated with Ms. Harris's claim). Progressive employees communicated with Mr. Dewberry to learn his diagnosis of the engine issue. Furthermore, four different Progressive employees gave input on the case before Progressive made the decision to deny coverage.

Aplt.'s Mot. to Strike Aplee.'s Supp. App. (dated May 18, 2017) [hereinafter, "Aplt.'s Mot. to Strike"].  Ms. Harris also seeks an award of the attorneys' fees that she incurred in filing her motion ($795.00), and an award for the cost of producing the Appellant's Appendix ($1,363.81).  *Id.* at 7.

Progressive's Supplemental Appendix is a thirty-three page document filed with this court on May 11, 2017.  It is composed of three items: the district court's docket sheet, Progressive's trial exhibit No. 3 (which contains copies of documents and drafts showing Progressive's payment of various claim expenses related to Ms. Harris's vehicle), and an excerpt from Ms. Martin's deposition. *See* Aplee.'s Supp. App. at i.

We note at the outset that our local rules allow an appellee to file a supplemental appendix.  *See* 10TH CIR. R. 30.2(A)(1) ("An appellee who believes that the appellant's appendix omits items that should be included may file a supplemental appendix with the answer brief.").  Therefore, Progressive's action in filing such an appendix is not itself remarkable or inconsistent with our prescribed practices.  Keeping this in mind, and with further explication *infra*, we deny (1) Ms. Harris's motion to strike Progressive's Supplemental Appendix, (2) her request for attorneys' fees related to this motion, and (3) her request for the costs of the Appellant's Appendix.

**A**

Ms. Harris's first argument in favor of striking is that the district court's docket sheet—which was included in the Supplemental Appendix—had already been included in her Appellant's Appendix. Ms. Harris seems to reason that the duplicative nature of the document renders its submission invalid. Aplt.'s Mot. to Strike at 6. Progressive, on the other hand, claims that it included the docket sheet because of "an ambiguity in the Tenth Circuit's Rules on the matter." Aplee.'s Resp. to Aplt.'s Mot. to Strike Aplee.'s Supp. App. at 5 (dated Jun. 1, 2017) [hereinafter "Aplee.'s Resp. to Strike"]. Specifically, "Tenth Circuit Rule 30.1(d)(3) simply states that '[a] copy of the district court docket entries should always be the first document in the appendix.'" *Id.* Because the rule does not confine its applicability to the Appellant's Appendix, Progressive argues that it included the docket sheet in its Supplemental Appendix out of an abundance of caution. *Id.* We need not definitively opine on whether our local rules are in fact ambiguous in this respect in order to conclude that Progressive acted in good faith—given its facially plausible rationale—when it included the docket sheet in its Supplemental Appendix, and there is no reason to strike the Supplemental Appendix on this basis.

Ms. Harris also argues that some of the claim payment documents were "not in the trial court record," and thus not properly before this court, because our precedent typically precludes us from reviewing evidence that was not before the

district court when the rulings at issue were made.  Aplt.'s Mot. to Strike, at 5–6

(citing *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir. 2008) ("We

generally limit our review on appeal to the record that was before the district

court when it made its decision.")).  We may deny Ms. Harris's motion on the

sole basis that none of the materials in Progressive's Supplemental Appendix are

necessary for our disposition of this case.  *See Tilton v. Capital Cities/ABC, Inc.*,

115 F.3d 1471, 1473 n.1 (10th Cir. 1997) ("[Appellant] moves to strike certain

exhibits from the defendants' supplemental appendix.  Because none of the

materials that [appellant] finds objectionable were necessary to our disposition of

the case, we deny [appellant's] motion.").

## B

We next address Ms. Harris's request for an award for the cost of preparing

her Appellant's Appendix.  Aplt.'s Mot. to Strike, at 7.  In essence, Ms. Harris

avers that she should be granted costs because Progressive's documents ended up

predominating in the Appellant's Appendix.  According to Ms. Harris, even after

she included "Appellee's voluminous 1,982 pages of summary judgment briefing

and exhibits . . . Appellee chose to designate 825 more pages of documents for

the appendix." *Id.* at 5.

But this is not a sufficient reason to shift the cost of the Appellant's

Appendix onto Progressive.  Under Rule 30(b)(2) of the Federal Rules of

Appellate Procedure, "[u]nless the parties agree otherwise, the appellant must pay

the cost of the appendix." FED. R. APP. P. 30(b)(2).  The Rule goes on to say that "[i]f the appellant considers parts of the record designated by the appellee to be unnecessary, the appellant may advise the appellee, who must then advance the cost of including those parts." *Id.*

There is no evidence in the record that Ms. Harris raised such an objection with Progressive.  In the absence of any earlier complaints from Ms. Harris as to Progressive's designation of materials for the Appellant's Appendix, we will not grant her an award for appendix-related costs.  Furthermore, having discerned no merit in her motion to strike, we deny Ms. Harris's request for attorneys' fees incurred in litigating the motion.

## V

Accordingly, we **AFFIRM** the district court's grant of summary judgment to Progressive on Ms. Harris's bad faith claim, and **DENY** Ms. Harris's Motion to Strike Progressive's Supplemental Appendix in its entirety.


ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge


41

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Elisabeth A. Shumaker<br>Clerk of Court | July 02, 2018 | Chris Wolpert<br>Chief Deputy Clerk |

Mr. James Buxton II
Buxton Law Group
511 Couch Drive, Suite 300
P.O. Box 18606
Oklahoma City, OK 73154

Mr. Spencer Habluetzel
P.O. Box 802
Wheatland, OK 73097

Mr. Travis C. Smith
TCS Law Firm
Victoria Building, Suite 222
1901 North Classen Boulevard
Oklahoma City, OK 73106

**RE:      16-6336, Harris v. Progressive Direct Ins. Co.**
            Dist/Ag docket: 5:15-CV-01252-HE

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court


cc:      Dawn Michelle Goeres
         Brad Leslie Roberson


EAS/dd